SARAH B. GILDERSLEEVE *vs.* EDWIN C. GILDERSLEEVE.

Third Judicial District, Bridgeport, October Term, 1914.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

One who seeks a divorce from a nonresident respondent must have acquired a bona fide domicil in the State in which the action is brought, otherwise its courts are without jurisdiction of the *res*, that is, the existing marriage status.
Whether such a domicil has been acquired or not in the foreign State, being a jurisdictional question, is re-examinable here when properly put in issue; and its determination by the trial court, unless contrary to the evidence, is conclusive upon this court on appeal.

Gildersleeve v. Gildersleeve.

The word "reside" or "residence," if used—as in the present finding—to describe an established place of abode adopted with no present intention of removing elsewhere, is synonymous with domicil.

A residence which is merely colorable confers no jurisdiction upon the local courts to grant a divorce which has any exterritorial validity.

The motive which prompts a change of domicil is undoubtedly pertinent evidence upon the question of the good-faith character of the change; but there is no rule of law which prevents one from actually changing his domicil in order to more speedily and readily secure a divorce, or any other advantages he may think the laws of the new domicil may afford him. To be effective, however, the change must be a real and bona fide one, made without any intention of removing elsewhere.

Although there is no constitutional obligation upon the courts of one State to recognize a decree of divorce rendered in another State against a resident of the former who did not appear and who was not served with process within the jurisdiction of the court passing the decree, it nevertheless is incumbent upon courts of other States, as an act of interstate comity, to give full recognition to such a judgment or decree, unless the protection of its own citizens or some paramount rule of public policy forbids.

The fact that another State allows a divorce for a shorter period of desertion than that prescribed by our statute (§ 4551), is not so repugnant to our public policy or to good morals as to justify our courts in refusing to recognize a divorce obtained in such a State for such a cause; nor can we consistently complain of the method of service upon nonresident respondents in divorce cases, where the laws of the other State are precisely like our own.

The doctrine of comity rests upon something more than mere courtesy and good will, and an adherence thereto is especially desirable in securing a uniform treatment of divorced persons, their children, property and property rights, and by this means avoiding the unwholesome and harsh consequences, as well as the confusion and uncertainties, which are the natural fruits of the opposite course.

Argued October 27th—decided December 21st, 1914.

ACTION praying for a divorce upon the ground of desertion, brought to and tried by the Superior Court in New Haven County, *Holcomb, J.;* facts found and judgment rendered dismissing the action upon the ground that the marriage relation theretofore existing had already been dissolved by a valid judgment of the Circuit Court in South Dakota, in a suit begun and prosecuted in that State by the present defendant

against the plaintiff, and from this judgment of dismissal the plaintiff appealed. *No error.*

*Benjamin Slade* and *Spotswood D. Bowers,* with whom was *William F. Alcorn,* for the appellant (plaintiff).

*Jacob P. Goodhart* and *Samuel A. Persky,* for the appellee (defendant).

PRENTICE, C. J. The plaintiff seeks a divorce from the defendant upon the ground of desertion. The parties were married in 1890 at New Haven in this State, where both then resided, and there they thereafter lived together as man and wife for a time. In his answer the defendant asserts that the matrimonial bond between them was dissolved in January, 1896, by a judgment of divorce entered upon his application by a court of competent jurisdiction in South Dakota, where he then resided. A judgment of divorce from such court is shown. If it was a valid judgment and entitled to recognition in this jurisdiction, the parties were not united in wedlock at the date of the institution of these proceedings. The trial court accorded this judgment full faith and credit, and, finding that by virtue of it the marriage tie theretofore existing between the parties had been dissolved, dismissed the complaint for that cause. As there can be no divorce where there is no existing marital relation, this action was correct, if the judgment of the South Dakota court is to be recognized here as terminating the marriage status. The field of our inquiry is thus limited to questions which concern either the validity of the South Dakota judgment or its recognition by the courts of this State.

First, as to the validity of the South Dakota judgment as such. The present plaintiff never resided in that State. If the court which entered the judgment

in favor of her husband acquired jurisdiction entitling it to adjudicate in the premises, at least in a way to claim consideration outside of the borders of the State, it was by reason of the plaintiff having had his domicil at the time in South Dakota, and proper service upon or notice to the nonresident defendant having been made or given. Personal service was made upon her at her home in this State, and therein the order of the court and laws of South Dakota in that regard were fully complied with. Domicil on the part of the plaintiff was a necessary condition precedent to the jurisdiction of the court, since the situation presented no other feature capable of furnishing jurisdiction of the *res*, to wit, the existing marriage status. *Ditson* v. *Ditson*, 4 R. I. 87, 93; Minor on Conflict of Laws, p. 193, § 88. If it existed, jurisdiction to render a decree adjudicating upon the plaintiff's matrimonial status could be acquired, and in this case was acquired.

The trial court has found that Mr. Gildersleeve in 1894 "went to Sioux Falls in the State of South Dakota to reside, and there resided for about two years." The word "reside," as also its cognate "residence," is employed in a wide variety of significations. It is evident, however, that the trial court did not use it in the passage quoted to indicate a mere bodily presence or temporary sojourn, but as descriptive of an established place of abode adopted with no present intention of removing elsewhere, and thus as synonymous with domicil. This the plaintiff's counsel frankly recognize. If, therefore, the finding remains unchanged, no question can be made as to the jurisdiction of the South Dakota court, or the validity of its judgment as an adjudication of a competent tribunal.

The plaintiff's counsel in their draft-finding asked the court to find that Mr. Gildersleeve was not a bona fide resident in South Dakota when he instituted his

divorce proceedings, and further, in substance, that he did not bring his action in good faith, but imposed upon the court by falsely asserting his residence in that State. They now ask that the finding be corrected by adding these statements thereto. The pivotal fact here involved is that of the good or bad faith of the then plaintiff's residence. This factor is one of vital consequence, for, on the one hand, if his residence in South Dakota was a colorable one only, the foundation of jurisdiction for all exterritorial purposes was gone; while, on the other hand, if it was bona fide, jurisdiction might be acquired. The allegation of fraud in the assertion of residence adds nothing of practical importance. There could be no fraud as charged, unless the claimed residence was colorable only. If colorable, jurisdiction could not be acquired. *Haddock* v. *Haddock*, 201 U. S. 562, 610, 26 Sup. Ct. Rep. 525; *Ditson* v. *Ditson*, 4 R. I. 87, 93. That the judgment is open to collateral attack for the cause stated is well settled. *Haddock* v. *Haddock*, 201 U. S. 562, 608, 26 Sup. Ct. Rep. 525; *Thompson* v. *Whitman*, 85 U. S. (18 Wall.) 457, 469.

The finding as it stands, and especially in view of the refusal of the court to find bad faith as requested, clearly imports that Mr. Gildersleeve's residence in South Dakota was a bona fide one, and it must be so interpreted. The defendant was a witness in the trial below. He told his story of his movements during his married life both before and after leaving this State and after the granting of the South Dakota decree, including his return to this State, and the reasons which actuated him in his sojourn after leaving this State, and in his return thereto. He testified that he went to Sioux Falls with the intention of remaining there, and left there for reasons of health. The credibility of his story was a matter for the trial judge to pass upon. If

it was believed, the conclusion of the court that his residence in South Dakota was bona fide was an inevitable one. It was entitled to believe it, and we cannot properly disturb the conclusion reached.

It is suggested that the South Dakota residence could not have been bona fide for the reason that the unmistakable indications from surrounding circumstances are that he was moved to go to that State as one in which he could obtain a divorce more speedily and readily than in this State, and for the purpose of obtaining one. These considerations are indeed pertinent upon the question of the good-faith character of the change of abode, and we must assume that they were weighed by the trial court in connection with the other testimony bearing upon that point. But a motive and purpose such as indicated would not prevent the acquisition of a new domicil.

Whatever the motive or purpose actuating a change of domicil may be, the tests to be applied in determining whether one has in fact taken place do not include them. The sole conditions are: (1) an actual change of residence, and (2) the absence of an intention to remove elsewhere. "But if the *animus* really exists to remain there permanently, the fact that the motive of removal is to procure a divorce is immaterial." Minor on Conflict of Laws, p. 199, § 90. There is no rule of law which prevents one from changing his domicil in order to facilitate his obtaining a divorce or to secure other advantages he may think that the laws of the new domicil may afford him. He is free to change at his pleasure, but the change must be a bona fide one to be effective. If actual and bona fide, the change will be accomplished. *Fosdick* v. *Fosdick*, 15 R. I. 130, 23 Atl. 140; *Colburn* v. *Colburn*, 70 Mich. 647, 649, 38 N. W. 607; *Hegeman* v. *Fox*, 31 Barb. (N. Y.) 475, 479; *Albee* v. *Albee*, 141 Ill. 550, 563, 31 N. E. 153; *Gregory*

v. *Gregory*, 76 Me. 535, 539. "For the purposes of municipal law, in the absence of statute, and always for the purposes of private international law, the period during which the party is domiciled is immaterial. He acquires a domicil at the moment when actual residence is coupled with the *animus manendi*, and from that moment his status should be determined by the law of that country." Minor on Conflict of Laws, p. 199, § 90.

We have next to consider the question of recognition of the South Dakota judgment by the courts of this State.

As the defendant in that action, being a nonresident of South Dakota, did not appear and was not otherwise served than by the delivery into her hands at her home in New Haven in this State of a copy of the summons and complaint pursuant to an order of the court, we are not, as we understand the scope of the decision in *Haddock* v. *Haddock*, 201 U. S. 562, 26 Sup. Ct. Rep. 525, under constitutional obligation to accord recognition to the judgment rendered.

Our duty in that regard, however, is not measured by the provision of the Federal Constitution requiring that full faith and credit shall be given in each State to the judicial proceedings of every other State. "It is . . . a general principle, sanctioned and acted on in all civilized countries, that the laws of one will, by what is termed the comity of nations, be recognized and executed in another, where the rights of individuals are concerned." *Vanbuskirk* v. *Hartford Fire Ins. Co.*, 14 Conn. 583, 586. "The rules of comity may not be departed from unless, in certain cases, for the purpose of necessary protection of our citizens, or in enforcing some paramount rule of public policy." *Guaranty, etc., Deposit Co.* v. *Philadelphia, R. & N. E. R. Co.*, 69 Conn. 709, 720, 38 Atl. 792. Minor, in his Conflict of Laws, § 5, states the exceptions to the application of

the principle more fully and analytically as follows: "There may be said to be five instances wherein it is generally considered that the municipal law of the State where the question is raised (*lex fori*) forbids the enforcement of a foreign law. (1) Where the enforcement of the foreign law would contravene some established and important policy of the State of the forum; (2) where the enforcement of such foreign law would involve injustice and injury to the people of the forum; (3) where such enforcement would contravene the canons of morality established by civilized society; (4) where the foreign law is penal in its nature; and (5) where the question relates to real property." See, to the same effect, *Cristilly* v. *Warner*, 87 Conn. 461, 463, 88 Atl. 711; *Vanbuskirk* v. *Hartford Fire Ins. Co.*, 14 Conn. 583, 592.

In consonance with these principles, it is incumbent upon our courts, as an act of interstate comity, to accord to the South Dakota judgment full recognition, unless some one or more of these enumerated reasons dictate a different course. The only ones of possible present pertinence are the two which relate to public policy and good morals.

Plaintiff's counsel present two reasons in support of their contention that a recognition by us of the South Dakota decree would be in violation of our public policy, and incidentally, we assume, of public morals, to wit: (1) that the Connecticut statutory period of desertion had not, as they claim to demonstrate, run when the South Dakota court, acting under a statute making desertion for one year sufficient to authorize a decree, entered its judgment; and (2) that the defendant was a nonresident of the State, did not appear, and was not otherwise served than by the delivery into her hands in New Haven of a copy of the summons and complaint.

It has long been the policy of this State to grant divorces for desertion. Surely the period of it is not so much of the essence of the matter and does not so vitally affect public policy that it reasonably can be said that the granting of divorces for a period of desertion less than our own is so repugnant to our conception of public policy and of what makes for good morals as to justify us in refusing to recognize the judicial action of sister States in dissolving marriages under the conditions stated. The case is not one of a divorce granted for desertion in another State, while we decline to grant them for that cause. The variation between what was done and what we are doing concerns only the minor incident of the duration of the desertion and not the substance of the marital offense. If the proposition advanced, as applied to the present situation, is well made, we should logically be compelled to declare, should occasion arise, that no divorce granted in a sister State for a cause or under conditions which would not at the time have authorized the granting of one in this State should have recognition by our courts, except as the Federal Constitution compels such recognition. This we are not prepared to do.

We certainly cannot consistently complain of the foreign divorce which was granted to this defendant, as being one obtained by methods not consonant with our public policy, as having been granted against a nonappearing nonresident who was not served with process within the foreign jurisdiction. Our statutes provide, and have long provided, for service upon nonresidents precisely like that resorted to by the South Dakota court, and authorized the grant of divorces upon such service.

Counsel, however, have attempted to place this particular contention of theirs upon higher ground. They ask our attention to the unseemly picture which

is presented by would-be divorce-getters flocking to remote jurisdictions to secure their ends, not attainable at home by reason of stricter requirements there, and by its attending consequences, and we are invited to lend our aid in the maintenance of sound and wholesome social conditions by discouragement of the practice through a refusal to recognize divorces thus obtained, as far as we may be permitted to do so. Unfortunately for this appeal, the reverse side of the picture, presenting the consequences of the course advocated, is very far from an attractive one. It is no light matter, as affecting individual, social or civic interests and good morals, that, through the attitude of the courts in refusing recognition to the judicial action of sister States, a condition should be created where legitimacy becomes dependent upon State lines, where wives in one State become concubines when they pass into another, where husband or wife living in lawful wedlock in one jurisdiction is converted into a bigamist by change of location, where persons capable of inheritance in one part of our country are incapable in another, where certainty of status may readily give place to uncertainty and property rights be thrown into confusion.

The argument for uniform divorce legislation is indeed a strong one, but it by no means follows that, until that happy consummation is achieved, the public interest would be best served by the several States denying to the legislative and judicial acts of others that recognition without which conditions of uncertainty and hardship will abound until human nature is transformed.

"Comity . . . is neither a matter of absolute obligation . . . nor of mere courtesy and goodwill. . . . It is the recognition which one nation allows within its territory to legislative, executive or judicial acts of

another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton* v. *Guyot*, 159 U. S. 113, 163, 16 Sup. Ct. Rep. 139. Behind it lie considerations of benefit and advantage to be derived by its practice. For the present we may not have uniform divorce legislation, but we may contribute to a uniform treatment of divorced persons and their children, and property and property rights, by obeying the dictates of comity, and thus avoiding unwholesome and harsh consequences which are the natural fruits of the opposite course.

There is no error.

In this opinion THAYER, RORABACK and BEACH, Js., concurred.

WHEELER, J. (dissenting). Upon the evidence it does not seem to me a reasonable conclusion that Mr. Gildersleeve was a bona fide resident of South Dakota when he applied for and obtained his decree of divorce, or that the cause alleged (desertion) ever existed; on the contrary, it appears to me that he secured his decree of divorce by fraudulently imposing upon the court in respect to his residence and the desertion of his wife.

The evidence shows that Mr. Gildersleeve, a resident of Connecticut, did not support his wife; that when informed she was with child he denied its paternity, although subsequently by judicial decree acknowledging the paternity; that after the birth of the child in February, 1894, he provided no support for wife or child; that his wife had him arrested for nonsupport in August, 1894, and in September, 1894, judgment was suspended upon his agreeing to furnish weekly support;

that he continued to furnish this for six months and up to March, 1895; that either late in 1894, or early in 1895, he went west, and reached South Dakota probably in January, 1895, returned to Connecticut in February, 1895, and then returned to South Dakota, and shortly thereafter, and while he was making payments under the suspended judgment, and while he himself was deserting his wife and new-born son, he took steps toward beginning an action for divorce in South Dakota; that he brought this late in the fall of 1895, and less than a year after he reached South Dakota; and that he obtained the divorce January 11th, 1896, and returned to New Haven shortly thereafter.

It is clear that Mr. Gildersleeve went to South Dakota to obtain a divorce and escape the penalty liable to be imposed by the Connecticut court for non-support. It is also clear that the ground of his action was absolutely nonexistent, but this issue is not raised upon the pleadings. As the facts show that the plaintiff never had a bona fide residence in South Dakota, the decree was obtained by fraud, hence the full faith and credit clause of the United States Constitution does not compel us to recognize such a decree.