# BATES *v.* BATES

No. 2881

October 29, 1930.                    292 P. 298.

*Thatcher & Woodburn,* for Appellant:

*Roberts, Scanlan & Ingram,* for Respondent:

## OPINION

By the Court, SANDERS, J.:

This action was commenced in the court below in 1927 by Herbert Thomas Bates against his wife, Annie Eliza Bates, for divorce on the statutory ground of extreme cruelty. After a full hearing upon the pleadings and evidence, judgment was for the husband; the wife appeals. The facts and the applicable law being somewhat involved, we shall for clearness give a brief history of the case. The parties are English subjects; they intermarried at Penshurst, County of Kent, England, on July 15, 1908. The child issue of the marriage, Gladys Annie, now living, was born in December, 1911.

From the time of marriage up to January, 1913, their marital domicile was in England where the husband,

an electrical engineer by profession, was in the employ of an English public utility corporation. From January, 1913, up to December, 1919, the parties resided at Rothesay, Buteshire, Scotland, where the husband was employed as manager of a tram railway system in that city operated by said English public utility corporation.

Domestic differences having arisen between the parties of such nature and character as to threaten their permanent separation, on December 3, 1919, the parties entered into an agreement whereby it was understood and agreed that the wife should return to England and live with her parents for a period of six months, the husband to pay during that time two English pounds weekly for her support and the maintenance of their child. The agreement was carried out. The avowed and confessed purpose of the agreement was that it was considered at the time that at the expiration of six months the parties would become reconciled to each other and resume their marital relation in peace and harmony; but unfortunately the agreement failed of its purpose; it proved to be the climax of their conjugal life; they never again lived together.

In July, 1920, the husband left Scotland and went to Toronto, Canada. An extended correspondence was carried on between the parties in which there was a running discussion as to the terms and conditions upon which their marital relation should be resumed. Many of the letters exchanged between them are in evidence; extracts from certain of the letters which seem to express their true feelings towards each other follow. One from the husband, dated at Toronto, Canada, in November, 1920, reads:

"Dear Annie— * * * It is too late in the day for you to talk about us living happily together. No one can act as you did in the past and make the vilest of insinuations and then expect affection in return. Your mother instead of helping to mend matters did her best to widen the breach, and finished up by calling me among other things 'a blackguard.' I think she might have played the part of a mother better if she had shown

you the folly of your ways, and pointed out to you that your first duty was to your home and husband instead of absenting yourself for so many months annually as you did. I certainly expressed 'no wish' that you should come out here in any previous letter. I said 'if you wished to join me for the sake of Gladys—and Gladys only—I would send your passages.' It was merely a suggestion for her sake, and if you take it up you must clearly understand that it is purely a business arrangement and must stop there. My personal feelings are against any resumption of our former life and except for Gladys I would not consider sharing the same roof with you. There is, and can be, no question of affection as you managed to kill any there ever was a long time ago. I hope this letter makes it quite clear to you this time as I don't want you to come out with any wrong impressions.

"Yours &c.       Herbert."

A letter of the wife, dated at Penshurst, England, on October 28, 1920, reads:

"My dear Herbert: * * * This last year has been haunted every day by thoughts of you, & I have always had the hope of our reconciliation before me & if you could only believe in me a little more I think we could still live a happy life together again, if you really want me to come. Of course I am only too anxious to join you and that we should have a happy home together. Please let me know the address where I am to come to you and send me our tickets for the voyage and the rail and the necessary money that I shall require for our outfit and for the journey. Where do you think of settling in Canada or the States? Of course you will send me further particulars before sending me the tickets &c as I shall need a little time to get ready and must buy some warm clothing. * * * I remain

"Your loving wife      Annie."

In January, 1921, the wife wrote as follows:

"Dear Herbert, I was very surprised and put out to get such an unkind letter from you just before Christmas, in answer to mine, saying, I was quite

willing to join you in Canada. Your know yourself that we were very happy together until you met Mrs. Matthew and even now I am still willing to come out in Canada and try to live happily together again.

"I cannot understand why you are not more open with me and tell me what you are doing &c towards making a home for Gladys & me, at present you have told me nothing.

"And the only address I have is c/o Post Office, Toronto, surely you cannot think it right or reasonable to ask me & Gladys to cross the ocean and come to a great city like Toronto without knowing where you are living or what address we are to ask for. * * * I remain

"Your loving wife          Annie."

Their correspondence seems to have ended abruptly in April, 1921. The husband never returned to England or to Scotland, and the wife never left England.

On January 16, 1924, Annie Eliza Bates filed a petition against Herbert Thomas Bates in the High Court of Justice, Probate, Divorce, and Admiralty Division (Divorce) England. The petition, after reciting the marriage, the issue thereof, and the residence of the petitioner in the County of Kent, England, proceeds as follows:

"That the said Herbert Thomas Bates is an engineer that his address is c/o General Post Office Toronto Canada and that he is domiciled in England.

"That there have been no previous proceedings in this Division with reference to the said marriage.

"That the said Herbert Thomas Bates has deserted your petitioner for two years and upwards without reasonable excuse.

"Your petitioner therefore humbly prays that your Lordship will be pleased to decree:—

"That she may be separated from the said Herbert Thomas Bates and that she may be granted the custody of the child of the said marriage Together with such further and other relief as may be just."

The record discloses that a certified copy of said

petition, together with the indorsements thereon, was sealed, directed and mailed to Herbert Thomas Bates, c/o General Post Office, Toronto, Canada, Engineer. The indorsement on the petition was:

"Take notice that you are required within forty days after service hereof upon you inclusive of the day of such service to enter an appearance either in person or by your Solicitor at the Divorce Registry of the High Court of Justice at Somerset House Strand in the County of London should you think fit so to do and thereafter to make answer to the charge in this petition and that in default of your so doing the court will proceed to hear the said charges proved and pronounce Judgment your absence notwithstanding. * * *

"(Signed) H. F. C. Norbury, Registrar."

It is conceded that the petition with the indorsements was received in due course of mail, and that the respondent did not appear or answer the wife's petition as commanded, or at all.

On the 8th day of February, 1926, in said High Court of Justice, Probate, Divorce, and Admiralty Division (Divorce), before the Right Honorable Lord Merrivale, the president, sitting at the Royal Courts of Justice Strand in the County of Middlesex, England, said petition of Annie Eliza Bates v. Herbert Thomas Bates came on for hearing. After taking the oral evidence of the petitioner in support of the petition, and after having heard counsel thereon on behalf of the petitioner, the president by his final decree pronounced a decree of judicial separation between Annie Eliza Bates and Herbert Thomas Bates, by reason that the said Herbert Thomas Bates had deserted the said Annie Eliza Bates for two years and upwards without reasonable excuse. On the application of counsel for the petitioner, it was ordered that the child issue of the marriage remain in the custody of the petitioner until further order of the court.

Herbert Thomas Bates left Toronto, Canada, and arrived in the city of Reno, Washoe County, State of Nevada, on the 13th day of October, 1926. Thereafter,

on, to wit, March 23, 1927, Herbert Thomas Bates filed his bill or complaint in the court below against Annie Eliza Bates for a divorce, on the ground of extreme cruelty, and thereafter, on, to wit, June 9, 1927, with leave of court, filed his amended complaint.

The amended complaint, after setting forth the intermarriage of the parties, the child issue thereof, and, after alleging the necessary jurisdictional fact of the plaintiff's bona fide residence for three months immediately preceding the commencement of the action in the county of Washoe, State of Nevada, proceeded to allege that since their intermarriage the defendant had been guilty of extreme cruelty to and towards the plaintiff, as follows:

1. That commencing during the year 1913, and continuing thereafter, the defendant adopted and followed a premeditated course of conduct consisting of nagging and finding fault with the plaintiff.

2. That the defendant became cold and distant to and toward the plaintiff and frequently left the home of the parties and remained away for months at a time, against plaintiff's will and consent, which conduct embarrassed the plaintiff through the gossip of plaintiff's friends and acquaintances.

3. That the plaintiff's occupation at Rothesay, Scotland, was such that required certain hospitality and social intercourse, and that plaintiff was required to and did accept invitations from business and personal friends, but, owing to the unconcern and indifference on the part of the defendant, the plaintiff was humiliated and embarrassed at his inability to return such hospitality.

4. That on one occasion the defendant removed her personal effects and part of the household furniture and wedding presents without any explanation to plaintiff, which conduct caused the plaintiff much mental anguish and worry.

5. That on account of defendant's frequent and continued absence from home, the child of the parties became almost a stranger to the plaintiff, resulting in

diminishing the child's love and affection for plaintiff.

6. That the defendant took no interest in plaintiff's affairs or social life and exhibited utter indifference to his affairs and home life, and that such conduct caused the plaintiff mental suffering and worry.

7. That because of the continued separation of the plaintiff and defendant, and through defendant's absences from their home, the defendant told plaintiff that her father had said to her in effect that, as they were not cohabiting, the plaintiff must be going with other women, and the defendant stated that she believed such to be true, thereby insinuating that plaintiff's conduct with other women was improper.

8. That the defendant was extremely jealous of plaintiff and frequently accused him of posing as a single man during the defendant's absence, and stated to the plaintiff: "You are too fond of other women." And on another occasion, when the duties of the plaintiff took him to a neighboring town where he was required to stay over night, on his return the defendant asked plaintiff the question: "What girl did you spend your time with last night?"

9. That the defendant constantly assumed a haughty attitude towards plaintiff, and in the presence of plaintiff's friends would refuse to repay the hospitality shown the plaintiff while the defendant was absent from home, and the defendant would frequently slight plaintiff's friends in order to hurt plaintiff's feelings.

10. That the plaintiff's occupation did not require his employment on Sunday, and that when the family cook was off duty on Sunday the defendant refused to get plaintiff's breakfast, which made it necessary for plaintiff to do much of the household work.

11. That on one occasion the defendant, in the presence of plaintiff's friends, made a remark which humiliated the plaintiff, and frequently by her attitude and expressions showed dissatisfaction and discontent with being married to plaintiff, such as declaring in substance: "It's a pity you were not sent to France as you might have been killed and I would have been a widow."

And also by declaring: "You are a blackguard and I wish I had never married you."

The complaint concludes with the statement that plaintiff and defendant are both educated and refined persons, and that, by reason of the aforesaid acts of extreme cruelty on the part of the defendant to and towards the plaintiff, plaintiff suffered great and grievous mental pain, so that plaintiff's life had become miserable and unhappy and his health had become impaired, and that the object of the marriage had been destroyed, and that further cohabitation of the plaintiff with the defendant was unbearable and impossible, and that there was no possibility of a reconciliation between the parties. Wherefore the plaintiff prayed judgment for divorce, and that the parties be restored to the status of unmarried persons.

The defendant, through her counsel, interposed a demurrer to the complaint, which was overruled; thereupon she answered the complaint and for answer specifically denied each and every of its allegations charging the defendant with marital misconduct and ill treatment, and, in addition to her denials and for separate defense, set up the decree of judicial separation pronounced by said English court hereinabove referred to. The defendant, by way of counterclaim, alleged, in substance, the plaintiff's desertion of the defendant for a period of more than two years immediately preceding the commencement of his action, without cause or fault on the part of the defendant, and that for said period of time the plaintiff had failed and neglected to provide the defendant and her child with the common necessities of life, and that such failure and neglect was willful and not due to poverty which could not be overcome by ordinary industry; she alleged that $100 per month was necessary for her support and the maintenance of her child; wherefore she demanded judgment against the plaintiff for the sum of $100 per month, payable each and every month thereafter, and prayed that she be granted a decree for separate maintenance.

The plaintiff made reply to the new matter contained

in the defendant's answer, and for reply denied that said English decree of judicial separation between the parties operates as a defense or bar or estoppel to the plaintiff's cause of action, for the reasons that said English court was without jurisdiction of the subject matter and of the parties, and that the cause of action upon which said English decree of separation for desertion was rendered was different from that of the plaintiff's cause of action for divorce in Nevada for cruelty.

The plaintiff for reply also denied the allegations contained in the defendant's so-called counterclaim, and in this connection alleged, in substance, that in December, 1913, the parties entered into an oral agreement whereby they were to live separate and apart for a period of six months, and during said period the plaintiff was to pay to the defendant two English pounds per week, and that, upon the termination of said six months, the plaintiff and defendant were to again resume cohabitation as husband and wife; that during said six months the plaintiff did pay to the defendant said sum per week, and that at the end of said time, and ever since, the defendant has willfully failed and refused to cohabit with the plaintiff, in accordance with said oral agreement. The plaintiff for reply denied that the sum of $100 per month was necessary for the support and maintenance of the defendant and their minor child, and in this connection alleged that the defendant had an income from her own personal property of approximately five hundred English pounds per year; wherefore the plaintiff prayed that the defendant take nothing by her amended answer and counterclaim, and that the plaintiff have the relief prayed in his complaint.

Upon the trial, the plaintiff testified, as a witness in his own behalf, respecting the married life of the parties, and in support of the allegations of his complaint charging the defendant with extreme cruelty. The defendant did not appear in person at the trial; the evidence on her part is in form of depositions consisting of the deposition of the defendant, that of her father, and those of two English barristers at law, Geoffrey Clifford Tyndale and Thomas Bucknill.

The case was tried to the court, without the assistance of a jury; upon the conclusion of the trial, the court took time to consider of its decision, and thereafter, in its opinion filed in the cause, intimated that the case was one for reconciliation, but that, the parties not having taken advantage of the opportunity afforded for that purpose, the court decided that the plaintiff was entitled to judgment. In accordance with its opinion and decision, the court found in substance that all the allegations of the plaintiff's complaint were true and supported by the evidence; and expressly found that the English decree of judicial separation granted the wife in evidence did not constitute a defense or bar to the plaintiff's cause of action for divorce in Nevada on the ground of extreme cruelty. The court further found that the allegations contained in the defendant's counterclaim or cross-complaint were not true and not sustained by the evidence. From these findings the court concluded that as a matter of law the plaintiff was entitled to a divorce, and that the parties should be restored to their original status as unmarried persons. Upon the court's findings and conclusions it was so adjudged and decreed.

As many as fourteen errors are assigned for the reversal of the judgment and the order denying the wife a new trial. So far as the appeal taken from the order denying and overruling the defendant's motion for new trial is involved, the assignments of error are directed mainly to the question of the legal sufficiency of the evidence to support the finding of the trial court that the "allegations contained in the plaintiff's complaint charging the defendant with extreme cruelty are true and sustained by the evidence." So far as the validity of the judgment is assailed, the assignments are directed mainly to the finding that the decree of judicial separation of the parties in England pleaded as a complete defense "is not a bar to the plaintiff's securing the relief prayed for in his complaint." So far as the assignments pertain to the finding of the trial court that the allegations contained in the defendant's counterclaim are untrue and not supported by the

evidence, the assignments are directed mainly to the point that the evidence is not sufficient to support the finding.

I am clearly of the opinion that the plaintiff did not allege and prove such acts of marital misconduct or ill treatment on the part of the defendant as to entitle him to a divorce on the ground of extreme cruelty. The most serious charge made in the complaint is, in substance, that, commencing during the year 1913, the defendant became cold and distant to and towards the plaintiff and frequently would leave plaintiff's home and remain away for months at a time against plaintiff's will and consent and without informing plaintiff as to when she would return. The evidence does not support the allegation; on the contrary, according to plaintiff's own testimony given on cross-examination, he admits that the wife's absence from home was with his knowledge, acquiescence, and consent. The proof shows that the absences complained of in each instance were occasioned by the wife's visits with her parents and her husband's relatives with the husband's approval. Furthermore, I am satisfied from the evidence, particularly the letters in evidence, that the absences of the wife had nothing whatever to do with the voluntary separation of the parties on December 3, 1919. This correspondence tends to show that there was no friction or quarrelling between the parties prior to the husband's meeting with one Mrs. Matthew, and a letter which purports to have been written by him to said Mrs. Matthew fell into the hands of Mrs. Bates, which letter is designated in the record as the "sweetheart of mine letter."

I am further of the opinion that the allegations contained in the complaint, when taken and considered in the light of the evidence, do not, either singly or collectively, amount to legal cruelty.

Whether or not the judicial decree of separation granted the wife by the English High Court of Justice on February 8, 1926, constitutes a defense to the plaintiff's subsequent cause of action for divorce in Nevada on the ground of alleged cruelty occurring prior to the

rendition of said decree is considered by us to be a question of first and controlling importance in the case. This, aside from my individual views as to the merits of the case of either party.

The depositions in evidence of the English barristers at law, Mr. Tyndale and Mr. Bucknill, deal solely with the validity and effect of the English decree of separation; both Mr. Tyndale and Mr. Bucknill are barristers at law of the Honorable Societies of the Inner and Middle Temples, learned in the English law, and have practiced for many years exclusively in the Probate, Divorce, and Admiralty Division of the High Court of Justice.

It is conceded, or must be conceded, that a suit for judicial separation — divorce a menso et thoro — being instituted primarily, not for the purpose of dissolving the marriage, but for the protection of the wife or husband, as the case may be, does not affect the marital status; it is not a final decree, but is terminable at any time by the reconciliation of the parties. Such a decree has no resemblance to a judgment in rem. Pettis v. Pettis, 91 Conn. 608, 101 A. 13, 4 A. L. R. 852; Piggott on Foreign Judgments and Jurisdiction (Eng. 3d ed.), page 192.

This being so, the question arises, what is the extraterritorial operation of a decree of judicial separation? The modern tendency in this country, say annotators, is to recognize foreign judgments in personam as conclusive, where they are rendered on the merits, in foreign courts having jurisdiction of the parties. See Johnston v. Compagnie Generale Transatlantique, 46 A. L. R. 435, note 3, page 450, entitled "Judgments in personam, not affecting status." 242 N. Y. 381, 152 N. E. 121.

The learned barristers at law inform us that the High Court of Justice, which pronounced the decree in question, has jurisdiction to grant judicial separation in two cases, namely: "(1) Where at the commencement of the suit both parties are resident in England; (2) Where at the commencement of the suit the husband is domiciled in England." We also infer from their testimony that an order for service abroad of a petition for judicial

separation is permissible under the English practice.

One of the cross-interrogatories propounded each of the barristers was, in substance, referring to the purported judgment of the High Court of Justice: Does such judgment state jurisdictional grounds or jurisdictional facts sufficient to permit it to be pleaded in bar or res judicata if the jurisdiction of such court is questioned as to the domicile and residence of the defendant in such judgment? The answer of Mr. Tyndale to the question was as follows:

"On February 8th, 1926, Mr. Bates was a resident out of the jurisdiction (See Paragraph 5 of Mrs. Bates' Petition Exhibit C). The Petition was duly served upon him. The said Paragraph 5 alleges, 'That the said Herbert Thomas Bates is an Engineer that his address is c/o General Post Office Toronto Canada and that he is domiciled in England.'

"In these circumstances the jurisdiction of the English Court depended on Mr. Bates having been at material times domiciled in England. He did not defend and allege the contrary. He is, therefore, estopped per rem judicata from ever alleging against his wife that at the time of the decree he was not domiciled in England."

From this statement of the law of England, it would appear that Mrs. Bates could not and would not have been granted a decree for judicial separation against her nonappearing husband unless she established to the satisfaction of the English court pronouncing the decree that Mr. Bates, her husband, at the time was domiciled in England, was duly served with process, and that he had deserted Mrs. Bates for a period of two years and upwards without reasonable excuse. What then, if any, is the extraterritorial operation of the decree for separation in question? In Foote's treatise on Private International Jurisprudence (4th ed.), p. 124, a standard English authority, he states: "It would appear that decrees for judicial separation, pronounced by Courts other than those of the domicile, can have no extra-territorial operation, and will only remain effective so long as the spouses (or at any rate one of them) remain within the jurisdiction."

Upon this authority it would appear that the decree for judicial separation in question, pronounced as it was by a court of the domicile, is to be accorded extra-territorial operation and effect, so long as one of the spouses remains within the jurisdiction. Mr. Bates, although served with process, did not appear in the English suit to contest the jurisdiction of the English court upon the ground that he was not domiciled in England.

Counsel for Mr. Bates insist that the decree for judicial separation in question cannot be accorded the force of res judicata, for the reason that the English judgment or decree for separation is based on the ground of the plaintiff's desertion without reasonable excuse, whereas plaintiff's suit for divorce in Nevada is based on the ground of cruelty. The answer of the English barristers to this contention is that the acts complained of in the plaintiff's complaint here could have been pleaded in the English suit and would have constituted a defense, if the English court held that as a matter of law the acts complained of negatived desertion. Further in this connection, the barristers testified that "extreme cruelty" is not a term known to the English law. If, however, Mr. Bates had been able to allege and to establish against his wife conduct which the English tribunal would have in the circumstances considered cruel, and which either injured his health or made injury a result reasonably to be expected, he would have had an answer to his wife's petition. Further in this regard they testified that any conduct by a wife which, in the opinion of the English court, justifies a husband in leaving her, if pleaded and established, is conclusive answer to a petition for judicial separation on the ground of desertion, because a wife cannot prove desertion without reasonable excuse. The testimony of the barristers in this regard is predicated upon the holding in Henderson v. Henderson, 3 Hare, 100, that the plea of res judicata applies, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to

the subject of litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time; in other words, we take it that, where both parties are before the court, the decree is conclusive as to the issues of fact upon which it is based. Harding v. Harding, 198 U. S. 317, 25 S. Ct. 679, 49 L. Ed. 1066.

Guided as we are by the testimony of the English barristers, we are assured that the judgment for judicial separation in question was granted by a court having jurisdiction in personam over both spouses, and that, so long as it remains in full force in England, it will operate as a bar to plaintiff's subsequent action for divorce there on the ground of cruelty occurring prior to the rendition of said decree, and, it further appearing from the testimony of the English barristers that a like judgment of judicial separation rendered in this forum would be accorded the same effect in England, we conclude that, in the absence of any showing of fraud, as a matter of comity the judgment for judicial separation in question operates as a bar to the plaintiff's action for divorce on the ground of cruelty occurring prior to the rendition of said decree. Entertaining these views, we are of opinion that the trial court erred in finding and adjudging that said decree for separation did not deprive plaintiff of the relief prayed in his complaint in this action.

The judgment is reversed.

DUCKER, C. J., and COLEMAN, J.:

We concur in the order of reversal solely on the ground that the judgment of judicial separation rendered in the English court is res adjudicata.

### ON PETITION FOR REHEARING